MICHAEL R. AND MARLA J. DYBSAND, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dybsand v. Commissioner
Docket No. 8772-88
United States Tax Court
T.C. Memo 1994-56; 1994 Tax Ct. Memo LEXIS 59; 67 T.C.M. (CCH) 2154; February 14, 1994, Filed *59 Decision will be entered under Rule 155. For petitioners: Robert E. Kovacevich. For respondent: Wendy Sands. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge D. Irvin Couvillion pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE COUVILLION, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1) [1]
6653(a)(2)
6659
1979
$ 5,138.09
$ 256.90
--
$ 1,541.43
1980
1,865.00
93.25
--
559.50
1981
2,732.40
136.62
[2]
819.72
1982
7,240.00
360.20
[2]
2,008.20
1983
9,061.40
453.07
[2]
2,718.42
*60 Respondent also determined that petitioners are liable for increased interest under section 6621(c) (formerly section 6621(d)) for all years at issue. This case is part of a national litigation project which has been identified by respondent as Philatelic Leasing. The project originally included over 800 individual taxpayers. The merits of the Philatelic Leasing promotion were considered by this Court in , affd. without published opinion , and . In both cases, this Court held that the taxpayers were not entitled to deductions and investment tax credits relating to the Philatelic Leasing activity because the stamp master leasing activity which was the subject of the promotion had no economic or business substance and was a sham. [2]
*61 In this case respondent conceded the addition to tax under section 6659 for 1982 and 1983 with respect to all adjustments in the notice of deficiency, except for the adjustment disallowing the investment tax credit claimed by petitioners. Petitioners conceded that the investment tax credits claimed for all years at issue were properly disallowed, and that all deductions relating to the stamp master leasing activity in excess of actual expenditures were properly disallowed. Petitioners contend that, to the extent of their cash expenditures, they are entitled to deductions relating to the stamp master leasing activity. The issues, therefore, subject to the concessions, are: (1) Whether petitioners are entitled to Schedule C deductions, including interest, with respect to a leased stamp master; (2) whether petitioners are liable for additions to tax under sections 6653 and 6659; and (3) whether petitioners are liable for increased interest under section 6621(c). FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. The stipulation and attached exhibits are incorporated herein by reference. Petitioners, husband and wife, resided in Kennewick, Washington, *62 at the time they filed their petition. Michael R. Dybsand (petitioner) attended high school through the 12th grade but was unable to complete his senior year due to a temporary loss of hearing. However, he passed a high school equivalency examination and received a General Educational Development (GED) certificate, after which he entered the U.S. Navy in September 1963. Petitioner served 4 years in the Navy as an interior communications electrician. For approximately 2 years after his naval service, petitioner participated in an electrical maintenance apprenticeship program in which he attended classes at Columbia Basin Junior College in Pasco, Washington, and worked at a nuclear facility as a maintenance electrician. At this nuclear facility, petitioner was responsible for maintaining equipment and keeping the control systems operable. From approximately 1974 until 1982, petitioner worked in the States of Washington, Oregon, Wyoming, California, and Arizona as an electrician for various construction companies. In 1982, petitioner began work as a permanent electrician at United Nuclear Corp. in the State of Washington. It was at this time, in 1982, when petitioner first learned *63 from a coworker of the Philatelic Leasing Program (Philatelic). Prior to 1982, petitioner's only exposure to stamps was from a few stamp-collector starter packets petitioner had as a child and stamps received as a gift from his grandmother. During 1982, in addition to petitioner's involvement with Philatelic, petitioners tried unsuccessfully to start a tree nursery and also considered a jojoba bean farm investment. Petitioner attended approximately four promotional meetings with two sales representatives from Philatelic and read the materials he was given at those meetings. He acknowledged having "trouble understanding" how he could "make any money at it". Philatelic offered to prospective investors an opportunity to lease a master plate (the stamp master) from which British local stamps for the islands of Bernera, Eynhallow, or Staffa (all privately owned islands located off the coast of Scotland) and ancillary products such as calendars, posters, or stationery could be produced. Such local stamps (also called "local carriage labels" in the philatelic industry) are not postage stamps as the term is commonly understood, since they are not recognized as evidence of prepayment *64 of postage by the British Government postal system or any other organized postal system operated by a member of the Universal Postal Union (the organization of all United Nations member states which engage in the international transport of mail). The stamps in Philatelic could only be used as postage for the carriage of mail between points on the islands or to the nearest British post office, where regular British postage would have to be affixed if the mail were to travel further. Thus, once mail utilizing these stamps was deposited in any other organized postal system, such mail required the necessary postage of that public carrier. The local stamps, therefore, neither had value to, nor were recognized by, any public governmental mailing system. Accordingly, the bulk of local stamps in Philatelic were issued for sale to collectors rather than for use as postage stamps. The Philatelic Leasing Program, as outlined in the Confidential Offering Memorandum (the offering memorandum), was founded upon a 7-year lease of stamp masters to investors, each consisting of photographic color separations from which the various British local stamps would be produced, together with related copyrights. *65 Each of the master plates leased from Philatelic carried with it the right to print an issue consisting of the following limited editions of stamps: 20,000 sets perforated stamps; 10,000 sets imperforated stamps; 10,000 deluxe sheets; and 20,000 souvenir sheets. The maximum face value [3] of the individual stamps was 2 British pounds. The offering memorandum suggested that investors contract with an established stamp distributor to arrange marketing of the stamps produced from the leased stamp masters. The offering memorandum described the stamp master leasing activity as highly speculative in nature. A substantial portion of the offering memorandum discussed the Federal income tax aspects of the stamp master leasing program. The memorandum estimated that the Federal tax benefits would be four times the cash invested. This section consisted of a 52-page legal opinion and letters prepared by a New York law firm, *66 and confirmation by a New York accounting firm that the two firms would represent Philatelic (and any of its lessees that requested representation) in the event the "tax structure" of the stamp leasing transaction was challenged by the Internal Revenue Service. Petitioners, however, were not represented by the New York firms in this litigation. The program called for seven annual lease payments of $ 30,000 each for a two-stamp master, financed largely by nonrecourse notes. [4] The program also included pass-through of the right to claim investment tax credit on the stamp masters, with such credit calculated upon Philatelic's cost of purchasing the masters from Hambrose, Ltd. Philatelic's purchase price for a two-stamp master was recited to be $ 150,000. In 1985, subsequent to petitioners' investment, the U.S. District Court for the Southern District *67 of New York decided that the stamp master leasing program promoted by Philatelic was an abusive tax shelter, and that the promoters of the shelter were enjoined from further promoting the leasing of stamp masters. This result was affirmed by the U.S. Court of Appeals for the Second Circuit. [5] In granting injunctive relief to the Government, the District Court found that the stamp masters leased by Philatelic in 1982 were grossly overvalued within the meaning of section 6700.
On December 22, 1982, petitioner entered the Philatelic leasing promotion by signing a preprinted 20-page "Lease and Security Agreement" to lease from Philatelic a two-stamp master for a total consideration of $ 210,000. According to the agreement, payments were to be made as follows: $ 4,500 cash due on closing, execution of a promissory note in the amount of $ 10,500 *68 due June 1, 1983, a $ 15,000 note (the second note), and six $ 30,000 notes. [6] All of the notes, except the first one, were due February 1, 1990, and bore simple interest at a rate of 10 percent per annum. No interest payment was due on the February 1, 1990, notes until the principal of all notes had been paid in full. All of the notes due February 1, 1990, were secured by the products derived from the stamp master and 50 percent of the proceeds from sales of such products. The second note provided that the maker was personally liable for the principal amount but not for any interest or costs in connection with any security interest relative to the note. One of the $ 30,000 notes specified that the maker had personal liability for only $ 6,000 of the $ 30,000 principal or of any interest or costs. The other five $ 30,000 notes were each labeled "Nonrecourse Note" and provided that the maker had no personal liability for any principal, interest, or costs. The term of the lease began December 1, 1982, and ended November 30, 1989. *69 Only after petitioner committed himself to Philatelic for the lease of a stamp master was he able to view the images available for a two-stamp master. At that time, petitioner knew that many of the images were unavailable because they had been chosen by other participants in the program; however, there was little information to indicate which images were still available. After making the initial cash payment, petitioner chose a master plate for stamps related to the island of Eynhallow. The stamp plate selected contained images of "Musketry", which were images of men in "revolutionary" clothing with black powder rifles. Petitioner chose that image because he believed "it was one of the few left remaining". Months later, when petitioner received a set of six printed stamps, the images he received were not the "Musketry" images he had originally selected; however, he made no effort to inquire about this substitution. Petitioner never saw the leased stamp master and obtained no insurance with respect to it. Petitioner never obtained an independent appraisal of the stamp master. When petitioner entered into the program and later chose a distributor, Dell Philatelic Consultants, *70 Ltd. (Dell), from a list provided by the Philatelic sales representative, he did not know what the plan or cost of distribution would be for the stamps. Although petitioner had no experience in marketing, he nevertheless reserved the right to market the stamps himself if Dell did not perform to his expectations. Petitioner selected Dell, located in Massachusetts, due to the "revolutionary" ties with that part of the country. Although the images petitioner actually received were not related to the Revolutionary War, he did not change the distributor. Subsequently, when Dell's sales of petitioner's stamps were insignificant, petitioner expressed dissatisfaction with Dell only for spending too much time "fighting off the wolves" over tax and legal problems and made no effort to change to another distributor. Petitioner never attempted to produce or market any products from his stamp image and plate. Petitioner would "stop in" on some stamp dealers when he traveled out of town in connection with his employment and "occasionally" inquired of others as to the marketability of topical stamps. He also talked to an individual who collected and sold stamps from her home. However, petitioner *71 made no serious inquiry of individuals, other than the Philatelic agents, as to the marketability of local carriage stamps similar to the type involved in the Philatelic program. Petitioner paid $ 4,500 cash at the time he entered into the program. After investing in Philatelic, petitioner obtained a State license to do business and opened a checking account under the name "Stamp Master", which listed himself as "proprietor". The following checks were written on that account: Date
Description
Payee
Amount
2/19/83
Printing
Philatelic
$  2,000.00
5/10/83
Distribution
Dell
500.00
5/26/83
Lease payment
Philatelic
10,500.00
Interest
Philatelic
460.27
6/14/83
Distribution
Dell
2,000.00
Total
15,460.27
Over the 7-year term of the lease, there were total stamp sales of $ 15. James A. Willms submitted a report and testified as an expert witness for respondent on the value of the stamp master. Petitioners presented no evidence of the value of the stamp master. Mr. Willms had 17 years' experience in marketing and management, which included 9 years in the philatelic field. At the time of trial, Mr. Willms was vice president and vice chairman of the board *72 of Unicover Corp. The Unicover Corp. is an international direct marketer of stamps and other philatelic products, coins, fine porcelain, and art prints, and is the largest private concern in North America dedicated to stamp collecting. In Mr. Willms' opinion the stamp master leased by petitioner had no value because it would not be possible to profitably market stamps produced from the master. Based upon his experience in marketing collector stamps, the cost of producing and marketing the stamps would exceed any anticipated revenue from sales because the market for such stamps was very limited. There is a detailed discussion of the support for Mr. Willms' opinion in his report submitted to the Court. Petitioners claimed credits and losses with respect to their philatelic leasing activity on their joint Federal income tax returns as follows: Year
Investment Tax Credit Schedule C Loss
1979
$ 5,138.09
--
1980
1,865.00
--
1981
2,732.40
--
1982
5,264.51
$  2,706.48
1983
--
38,348.34
Respondent disallowed the deductions and credits claimed by petitioners relating to the philatelic activity. OPINION As noted earlier, petitioners concede the investment tax *73 credits and all deductions in excess of the amounts actually paid. Petitioners made cash payments totaling $ 19,960.27 to Philatelic during 1982 and 1983, which includes $ 460.27 paid as interest on the first note. The Court first decides whether petitioners are entitled to deduct any of these amounts, other than the interest, which is considered separately. It is respondent's position that the transaction entered into by petitioners lacked economic substance and was a sham that should, therefore, be disregarded for tax purposes. In the alternative, respondent argues that petitioners were not engaged in a trade or business for profit. Petitioners maintain that they had the requisite profit objective, and that the program they invested in was economically viable. Deductions are strictly a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to any deductions claimed on the returns. Rule 142(a); ; . To establish that the transaction is not a sham and, therefore, to be entitled to deductions *74 from the transaction, petitioners must prove that the transaction had a legitimate business purpose and economic substance. , affg. in part and revg. in part . In determining whether the transaction petitioner entered into is a sham, the Court looks to business purpose and economic substance. Thus, the Court first addresses whether petitioner had a business purpose in entering into the lease with Philatelic. Petitioner testified that he entered into the transaction because he wanted to run his own business and earn a living in a job without uncertainty and without being required to travel away from home as he had done in the construction business. However, the Court notes that, at the time petitioner entered into the Philatelic transaction, he had already been hired as a "permanent" electrician by United Nuclear Corp. in Washington and was no longer required to work for different employers or to travel. Petitioner's actions, or lack thereof, with respect to the Philatelic transaction, reveal an indifference to profit considerations. *75 Prior to his involvement with Philatelic, petitioner had no exposure to the stamp collecting industry and had no experience in marketing. Petitioner admitted that, at first, he did not really understand how he could make any money with this venture, but he intensely studied the promotional materials provided by the Philatelic sales representatives. If read thoroughly, these materials reveal a concentration on the tax benefits to be gained by the investment and a description of the investment as highly speculative. Moreover, the benefits described are conditioned on the correctness of the assumed fair market value, yet petitioner never sought an independent appraisal of the product to be leased. Petitioner's superficial and occasional inquiries of others interested in stamp collecting do not constitute an independent investigation of the stamp industry, the market for British local stamps, or the viability of the venture as would be prudent under the circumstances. , affd. without published opinion . Before knowing or asking what it costs to print *76 or distribute the Philatelic products or what competitors would charge for such a service, petitioner chose Philatelic to print and Dell to distribute the stamps. There is no evidence that petitioners obtained information concerning possible distribution arrangements for the stamps or ancillary products to be produced from the leased master prior to entering into the lease. After entering into the lease, petitioner did nothing to promote the sale of the stamps or to change the marketing strategy when the stamps did not sell. Because petitioner could only choose a stamp master image after committing to the Philatelic lease, petitioner entered into a purported lease for $ 210,000 of a product which he had never seen and knew very little about. On this record, petitioner has not convinced the Court that, at the time the lease transaction was entered into, he had the requisite business purpose. The Court next considers whether the transaction had economic substance. This inquiry is objective and requires an analysis of the transaction as a prudent businessman would do to ascertain whether the transaction had any economic substance apart from its beneficial tax consequences. , *77 affd. in part and revd. in part . It is well established that a transaction which is devoid of economic substance is not recognized for tax purposes. . Petitioners contend they entered into the transaction to make a profit from the sale of the stamps. However, subjective intent cannot supply economic substance to a business transaction, and an individual's mere assertion of a subjective profit objective does not require the Court to recognize for tax purposes a transaction which lacks economic substance. . In determining whether a transaction has economic substance, a taxpayer's subjective statement as to his profit objective in entering into the transaction is relevant, but greater weight is placed on objective facts demonstrating a realistic potential for profit. A realistic potential for profit exists "when the transaction is carefully conceived and planned in accordance with standards applicable to a particular industry, so that judged by those standards the hypothetical *78 reasonable businessman would make the investment". . As stated above, in 1985, a U.S. District Court enjoined Philatelic from promoting the stamp master leasing program at issue herein. See , affd. . The Court there found that the stamp masters promoted by Philatelic were grossly overvalued within the meaning of section 6700. In this case, based on the testimony and report of respondent's expert, Mr. Willms, the Court concludes that the value of the stamp master (for which petitioner agreed to pay $ 210,000 primarily with nonrecourse notes and which was paid for partly with funds received from a refund due to an improperly claimed investment tax credit) is zero. Thus, the consideration petitioner agreed to pay for the lease of the stamp master greatly exceeded the fair market value of the property and rights received. Considering the record as a whole, we hold that petitioners have not carried their burden of proof with respect to establishing economic substance. The Court *79 has considered the multitude of cases cited by petitioners in support of their position that they are entitled to the deductions claimed; however, we find these cases totally inapplicable to the relevant issues of this case. Therefore, we conclude that petitioner entered into a sham transaction. When transactions are found to lack economic substance, this Court has held that cash payments made pursuant to such transactions "merely represent the fee which petitioners paid to purchase tax benefits" and, consequently, they are not deductible. , affd. without published opinion sub nom. , affd. sub nom. , affd. without published opinion , and affd. sub nom. . Accordingly, respondent's determination that petitioners are not entitled to a deduction for payments related to Philatelic, other than for interest, *80 is sustained. On their 1983 Federal income tax return, petitioners deducted $ 460.27 for interest paid on the $ 10,500 note due June 1, 1983. In , the Fourth Circuit Court of Appeals held that interest paid on recourse debt incurred in connection with a sham transaction is deductible if the recourse notes are genuine obligations. The $ 10,500 note executed by petitioners is recourse on its face, and petitioners paid the principal amount of the note and $ 460.27 in interest in 1983. Accordingly, we hold that, although the note was given in connection with a sham transaction, it represents a genuine obligation upon which principal and interest were paid. Petitioners are, therefore, entitled to deduct the interest paid on this note in 1983. The next issue for decision is whether petitioners are liable for the additions to tax. Section 6653(a) for tax years 1979 and 1980 and section 6653(a)(1) for 1981 through 1983 imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. For *81 1981, 1982, and 1983, section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. . There was no objective support for the value of the stamp master upon which petitioners claimed deductions and the investment tax credit. Petitioner was aware that the correctness of claiming the deductions and investment tax credit related to Philatelic could be questioned when petitioners filed their income tax returns. Petitioner testified that he originally did not plan to apply for the investment tax credit if he could find financing for the Philatelic venture through another source so he "wouldn't have to argue points with the IRS or anybody else". Petitioners filed Form 3468, Computation of Investment Credit, with their 1982 Federal income tax return, claiming $ 15,000 investment credit of which $ 9,735.49 was carried back to petitioners' 1979, 1980, and 1981 taxable years. Subsequently, *82 petitioners applied for and received a tentative refund based on this carryback. Therefore, petitioner claimed the investment credit to "finance" his Philatelic investment and pay other debts irrespective of whether petitioners were legally entitled to the credit. Petitioner admitted that he did not really know what he could properly deduct or claim as an investment tax credit, yet an accounting or tax expert was never consulted. Overall, petitioners' actions were not those which reasonable and prudent persons would have taken under the circumstances. Accordingly, we hold that petitioners negligently and intentionally disregarded rules and regulations. Petitioners are, therefore, liable for the additions to tax under sections 6653(a) and 6653(a)(1) and (2). Respondent also determined that petitioners are liable for the addition to tax under section 6659 for an underpayment of tax attributable to a valuation overstatement. Section 6659 imposes a graduated addition to tax on an underpayment "attributable to a valuation overstatement". Section 6659(c) provides that "there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed *83 on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis". If the claimed valuation exceeds 250 percent of the correct value, the addition to tax is equal to 30 percent of the underpayment. Sec. 6659(b). Section 6659 does not apply to underpayments of tax which are not "attributable to" valuation overstatements. , affd. . Petitioners stipulated before trial the disallowance of the investment tax credits which were claimed in relation to the stamp master leasing program. Due to this concession, petitioners claim that they are not liable for the section 6659 addition to tax based on this Court's opinions in , and The cases cited by petitioner are distinguishable from petitioners' situation. In , this Court found that section 6659 did not apply. In that case the investment tax credits were *84 disallowed when, although overvalued on the taxpayers' tax return, the property was not placed in service during the years at issue and, thus, the underpayment was attributable to something other than a valuation overstatement. The Court of Appeals, in affirming the decision, agreed that Congress apparently intended that the calculation of an underpayment attributable to a valuation overstatement be made after taking into account any other proper adjustment to tax liability. In , this Court found the taxpayers were not liable for the section 6659 addition to tax when, prior to the trial of the case, the taxpayers conceded that they were not entitled to the investment tax credit because the agreement in question was a license and not a lease; therefore, the underpayment was attributable to something other than a valuation overstatement. Concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. Instead, what is significant is the ground upon which the investment tax credit is disallowed or conceded. In petitioners' case, there was *85 no argument made and no evidence presented to the Court to prove that disallowance and concession of the investment tax credits related to anything other than a valuation overstatement. Therefore, petitioner did not prove that there was "any other proper adjustment to tax liability" such as was shown in the cases cited by petitioner. The Court has concluded that petitioners' stamp master leasing activity lacked economic substance. Where there is a lack of economic substance, section 6659 is applicable because the taxpayer's correct basis in the asset is zero, and any basis claimed in excess of zero is a valuation overstatement. , affg. ; , affg. ; ; ; ; . *86 Petitioners claimed an investment tax credit of $ 15,000 for the stamp master based upon a claimed purchase price and value of $ 150,000. Therefore, the adjusted basis of the asset claimed on petitioners' returns exceeds the corrected adjusted basis, which is zero, by more than 250 percent. Moreover, integral to and inseparable from the Court's conclusion that petitioners' stamp master leasing activity was without economic substance is the Court's finding that the stamp master was overvalued. This Court has been consistent in finding section 6659 applicable when the credits or deductions are disallowed in their entirety due to a lack of economic substance or lack of profit objective when valuation is an integral factor in such determination. . Petitioners, therefore, are liable for the section 6659 additions to tax with respect to all adjustments relating to disallowance of the investment tax credits. Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" (an underpayment in excess of $ 1,000) in a taxable *87 year "attributable to 1 or more tax-motivated transactions". The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the enactment of section 6621(c). , affd. without published opinion . Tax-motivated transactions include valuation overstatements and deductions disallowed from activities not entered into for profit. Sec. 6621(c)(3). Congress specifically amended section 6621(c)(3)(A), adding to the list of tax-motivated transactions "(v) any sham or fraudulent transaction." [7] Transactions which lack economic substance or business purpose are sham transactions for purposes of section 6621(c)(3)(A)(v). ; . The evidence is unequivocal that Philatelic had no economic substance, and the underpayments attributable to the program exceeded $ 1,000. Accordingly, the increased interest rate applies to the underpayments *88 attributable to all credits and deductions taken with respect to Philatelic. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. The additions to tax for negligence are codified under sec. 6653(a) for 1979 and 1980.↩
2. 50 percent of the interest payable on the entire deficiency.↩
2. Although the promotion in which petitioners were involved was similar to and structured in the same manner as the promotions in , affd. , and , the stamp masters selected by petitioners here were different.↩
3. The term "maximum face value" is used to denote individual stamps with different denominations.↩
4. The offering memorandum also described leases of four-stamp, six-stamp, and eight-stamp masters. Petitioner's agreement with Philatelic was for a two-stamp master.↩
5. , affd. .↩
6. The due dates on all promissory notes, except for the first $ 10,500 note, were part of the preprinted format of the agreement. Petitioner changed the due date for the first note from Feb. 1, 1983, to June 1, 1983. The later due date allowed petitioner to pay the note with funds received as a tentative refund due to the carryback of unused investment tax credits related to Philatelic which were originally claimed on petitioners' 1982 income tax return. It is this investment tax credit that petitioners now concede was properly disallowed.↩
7. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750. This amendment is effective for interest accruing after Dec. 31, 1984, the original effective date of sec. 6621(d).↩